UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
TRUSTEES OF THE NEW YORK CITY
DISTRICT COUNCIL OF CARPENTERS
PENSION FUND, WELFARE FUND,
ANNUITY FUND, AND APPRENTICESHIP,
JOURNEYMAN RETRAINING,
EDUCATIONAL AND INDUSTRY FUND,
TRUSTEES OF THE NEW YORK CITY
CARPENTERS RELIEF AND CHARITY FUND
and THE CARPENTER CONTRACTOR
ALLIANCE OF METROPOLITAN NEW
YORK,

                Plaintiff,                22-cv-522 (PKC)

        -against-           OPINION AND ORDER
                                        FINDINGS OF FACT AND
                                        <u>CONCLUSIONS OF LAW</u>

ALITE FLOORING LLC,

                Defendant.
-------------------------------------------------------------x

CASTEL, U.S.D.J.,

        The trustees of certain multiemployer employee-benefit funds affiliated with the

New York City District of Carpenters brought this action to recover delinquent contributions to

the funds, and other associated relief, against Alite Flooring LLC ("Alite"). The action

proceeded to trial before this Court. For the reasons that will be explained, the Court concludes

that plaintiffs proved that they are owed a total of $533,053.60 in unpaid contributions based on

11,043.5 hours worked by covered employees for which no contributions were remitted and an

additional 584 hours for which Alite remitted contributions at an incorrect lower rate.

        These are the Court's Findings of Fact and Conclusions of Law. Rule 52(a)(1),

Fed. R. Civ. P.

FINDINGS OF FACT

1.      The New York City District Council of Carpenters Pension, Welfare, Annuity, and Apprenticeship, Journeyman Retraining, Educational and Industry Funds (the "ERISA Funds") are multiemployer labor-management trust funds organized and operated in accordance with the Employee Retirement Income Security Act ("ERISA").  The ERISA Funds are organized and operated in accordance with Section 302(c) of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 186(c), and are employee-benefit plans within the meaning of Section 3(3) of ERISA, 29 U.S.C. § 1002(3).  The Trustees of the ERISA Funds are plaintiffs in this action and are fiduciaries of the ERISA Funds within the meaning of Section 3(21) of ERISA, 29 U.S.C. § 1002(21).  (JPTO ¶ B(1) (ECF 96).)[1]

2.      The New York City District Council of Carpenters Relief and Charity Fund (the "Charity Fund") is a charitable organization established under Section 501(c)(3) of the Internal Revenue Code, 26 U.S.C. § 501(c)(3).  (JPTO ¶ B(2).)  The Trustees of the Charity Fund are also plaintiffs.

3.      Plaintiff Carpenter Contractor Alliance of Metropolitan New York, formerly known as the New York City and Vicinity Carpenters Labor-Management Corporation (together with the Charity Fund and the ERISA Funds, referred to herein as the "Funds"), is a not-for-profit organization established under Section 302(c)(9) of the LMRA, 29 U.S.C. § 186(c)(9).  (JPTO ¶ B(4).)

4.      Defendant Alite Flooring LLC ("Alite") is a limited liability company that conducts business in the construction industry.  (JPTO ¶ B(5).)

5.      Alite performs floor-covering work in New York City.  (JPTO ¶ B(13).)

---

[1] The citation to evidence is exemplary and is not intended to convey that the cited evidence is the only supporting evidence in the trial record.

6.      Alite, through its owner Michael Malgieri, executed an agreement (the "International Agreement") with the United Brotherhood of Carpenters and Jointers of America (the "International Union"), on or around May 1, 2017.  (JPTO ¶ B(7); ECF 75-4 at 2.)

7.      The International Agreement requires Alite to remit benefits contributions and to "comply with the contractual wages, fringe benefits, hours and other working conditions established between the International Union affiliates and the employers or recognized employer agencies in the localities in which the Employer does any work within the jurisdiction of the International Union."  (JPTO ¶ B(8); Carey Dec. Ex. D (ECF 75-4).)

8.      The Court finds that Alite entered into the International Agreement and is bound by it.

9.      Alite, through Malgieri, separately entered into a collective bargaining agreement with the New York City District Council of Carpenters (the "Union") covering the period of July 1, 2011 through July 30, 2015.  That agreement is titled the "Independent Building Construction Agreement" (the "CBA").  (ECF 75-1.)  Malgieri's signature date on the CBA is July 12, 2016.  (ECF 75-1.)  The CBA states that it is "made and entered into this day July 1, 2011 of and effective as of July 11, 2016 . . . ."  (ECF 75-1.)

10.     Plaintiffs offered and the Court received into evidence a document consisting of the cover page of the CBA, a first page that recited its effective date, and two signature pages executed by Malgieri on behalf of Alite.  (ECF 75-1.)  It separately received into evidence an unsigned copy of the full CBA.  (ECF 75-2.)  The Court credits testimony offered by the plaintiffs that historically, due to the demands of physical storage space, the Union did not maintain complete copies of each signed collective bargaining agreement and instead maintained copies consisting of a cover page that identified that agreement's parties and all corresponding

signature pages.  (Tr. 16-17, 19-20; Carey Dec. ¶ 6 (ECF 75); Supp. Carey Dec. ¶¶ 8-12 (ECF

83).)  The Union separately maintained a full, unexecuted copy of the corresponding CBA.

(Carey Dec. ¶ 6.)

       11.    Alite has urged that the operative CBA is limited to the document

containing the cover page, the page with the effective date, and the signature pages, without the

substantive provisions of the full CBA.  (See, e.g., Def. Post-Trial Mem. at 2-4 (ECF 114).)

Alite offered no evidence at trial, including any testimony from Malgieri concerning the CBA.

Alite's unsupported assertion that the parties agreed to a CBA lacking substantive provisions and

containing only a cover page and signature pages is not persuasive.  The Court finds that Alite

entered into the full CBA, as annexed at Exhibit B of the Carey Declaration (ECF 75-2).

       12.    Alite previously acknowledged that it entered into the CBA in a

submission filed in support of its successful motion to vacate entry of default judgment.  In a

declaration signed on September 7, 2022, filed under penalty of perjury, Malgieri, on behalf of

Alite, stated that Alite entered into the CBA, stating: "Admittedly, the Funds demonstrated that

Alite Flooring executed a CBA with the Union covering July 1, 2011 through June 30,

2015 . . . ."  (Reply Declaration of Michael Malgieri ¶ 10 (ECF 38).)

       13.    The Court finds that Alite entered into the CBA and is bound by it.

       14.    The CBA provides that it "shall be renewed automatically for one-year

intervals thereafter unless notice to the other at their last known address has been provided by

either party . . . ."  (Malgieri Reply Dec. ¶ 10; ECF 75-2 at 57.)

       15.    Eamonn Carey, who has the job title of Director of Jurisdiction and

Agreements for the Union, searched Union records and found no written notice of termination of

the CBA. [2]  (Carey Dec. ¶ 8; Supp. Carey Dec. ¶ 16.)  Alite has not urged that it provided written notice of termination and did not offer such a written notice into evidence.

16.    The Court finds that neither party provided written notice of termination of the CBA.

17.    An additional, unsigned collective bargaining agreement, an "Independent Building Construction Agreement" with an effective date of July 1, 2017 to June 30, 2024, was received into evidence as Exhibit E to the Carey Declaration (the "2017 CBA").  (ECF 75-5.)  Pursuant to the International Agreement, Alite is subject to the 2017 CBA when performing work within its jurisdiction.  (Carey Dec. ¶ 10.)

18.    Article XV, Section 1 of the CBA requires Alite to "make contributions for each hour worked of all employees covered by this Agreement and employed by said Employer within the territory of this Agreement" to the ERISA Funds, each of which is individually identified.  (ECF 94-2 at 37.)  Section 2 of Article XV requires contributions to each of the ERISA Funds to "be in accord with this Agreement."  (ECF 94-2 at 39.)  That same provision requires contributions to the Charity Fund at a rate of $0.025 per hour.  (Id.)

19.    Article II, section 9 of the CBA provides that when Alite "desires to engage in resilient floor covering work, within the jurisdiction of Local Union 2287, then it shall be governed by the appropriate agreement, signed between the District Council and the Association of Employers engaged in such work."  (ECF 94-2 at 15.)  The 2017 CBA contains an identical provision.  (ECF 94-5 at 13.)

---

[2] The direct testimony of a witness within a party's control was presented by affidavit attested to on the witness stand and subject to cross-examination and redirect.

20.     Resilient floor-covering work includes vinyl flooring, carpet, vinyl composition tile (or "VCT") and glue-down flooring, but does not include ceramic or marble flooring, or nail-down wood flooring.  (Tr. 24-25.)

21.     The parties agree that, under Article II, section 9 of the CBA, the hourly contributions owed to the ERISA Funds are set forth in a separate agreement called the Multiemployer Association Resilient Floor Coverers Agreement (the "Multiemployer Agreement").  (Pl. Proposed Findings of Fact ¶ 20 ("Alite was required to pay the wages and benefits set forth in the Multiemployer Association Resilient Floor Coverers Agreement.") (ECF 110); see also Def. Proposed Findings of Fact ¶ 19 ("If an employer is covering floor-covering work under the [CBA], it is governed by the terms and conditions of the Multiemployer Association floor-covering collective bargaining agreement as set forth in Section 9.") (ECF 113).)

22.     The Funds did not offer into evidence the Multiemployer Agreement and it was not listed as a trial exhibit in the Joint Pretrial Order.  (Tr. 25-26, 30.)  Instead, the Court received into evidence an unsigned copy of the "Independent Resilient Floor Coverers Agreement."  (Tr. 15; ECF 93-1 (emphasis added); Supp. Carey Dec. ¶ 21.)  The Independent Resilient Floor Coverers Agreement is an agreement to be entered between an employer and the District Council of New York City and Vicinity of the United Brotherhood of Carpenters and Joiners of America.  (ECF 93-1.)  No party asserts that Alite entered into this "Independent" agreement.

23.     The Funds have not explained why they moved the "Independent" agreement into evidence but not the Multiemployer Agreement.

24.     Carey testified that the "Multiemployer" and "Independent" floor covers agreements are "identical." (Tr. 38.) William Davidian, the employer services director for the Funds, testified that "the contribution rates" for the "Multiemployer" and "Independent" floor covers agreements are "[m]ore or less" the same, meaning that "[t]hey usually follow the same rates, but sometimes the effective dates might be different." (Tr. 52.) After further questions, Davidian testified that "the rate package" for the "Independent" and "association" floor covers agreements are "the same. I misheard the question. I thought you were talking about the independent building and the floor covers." (Tr. 54.)

25.     Article VI, section 1 of the Independent Resilient Floor Covers Agreement contains tables with benefit-contributions rates for resilient flooring work performed in New York City. (ECF 93-1 at 11-14.) It identifies the hourly contribution rates to the ERISA funds to be made on behalf of employees with the Apprentice job title. (Id. at 13.) It identifies the hourly contribution rates to the ERISA funds to be made on behalf of employees with the job titles of Journeyman and Foreman, for the period of January 1, 2020 to July 1, 2020. (Id.) Thereafter, the hourly contribution rates to be paid to the ERISA funds are listed as "TBD." (Id.) The Court finds that the designation "TBD" was intended as the well-understood abbreviation for "To Be Determined."

26.     Employers receive contributions rate sheets from the Union and are separately given notice of the rates when they submit covered employees' works hours through a software platform called I-remit. (Tr. 54-55.) The contribution rates are set according to job and cannot be adjusted by the employer. (Tr. 55.) The Independent Resilient Floor Covers Agreement also requires that the employer make contributions through the I-remit system. (ECF 93-1 at 27.)

27.     Alite electronically remitted benefits contributions from 2017 through 2020, as reflected in a Report and Remittance History (the "Remittance History"), which lists payments by employee name, covered hours worked per week, and the amount remitted to the Funds.  (ECF 94-37.)

28.     Article XV, section 1 of the CBA requires Alite to submit to periodic payroll audits to verify that it has met its contribution obligations.  (ECF 94-2 at 38-39.)

29.     The firm Schultheis & Panettieri LLP conducted a payroll audit of Alite for the period of March 25, 2019 through June 19, 2022.  (ECF 77-2; McGourty Dec. ¶ 6 (ECF 77.)  Ryan McGourty, who has the job title of payroll audit supervisor at Schultheis & Panettieri, testified about the audit of Alite.  (ECF 77; Tr. 57-76.)  The auditors set forth their conclusions in an 81-page report (the "Audit Report").  (ECF 77-2.)

30.     Alite produced the following books and records for use in the audit: individual earning records and payroll records; quarterly payroll tax forms; W-3 forms; W-2 forms; general ledger; cash disbursements; and bank statements and canceled checks covering the period March 25, 2019 through June 19, 2022.  (McGourty Dec. ¶ 33.)

31.     There has been no suggestion that the books and records submitted by Alite were materially incomplete or reflect an attempt to obscure the hours worked by covered employees.  As will be discussed, the auditors estimated the weekly hours of two salaried employees, Dragan Matovic and Marcelo Servin, and concluded that Alite's records did not reflect 24 hours worked by employee David Cebic.  (ECF 77-2 at 4.)  The auditors otherwise relied upon Alite's records to ascertain the covered hours worked by its employees.  (ECF 77-2 at 1-2, 4.)

32.     The auditors determined a covered employee's total work hours by comparing the employer payroll records with federal and state payroll tax filings. (McGourty Dec. ¶¶ 11-12.)  They then compared these "Total Audited" hours to the hours paid to the Funds for each employee in a given week.  (McGourty Dec. ¶ 14.)  The difference between these two figures determined the amount of delinquent benefit payments owed to the Funds.  (McGourty Dec. ¶ 15.)

33.     The auditors determined that Alite failed to remit contributions to the Funds for 11,043.5 hours worked by covered employees during the 2019-2022 period. (McGourty Dec. ¶ 38; ECF 77-2 at 4, 33.)  They determined that for an additional 584 hours, Alite remitted contributions at an incorrect lower rate.  (McGourty Dec. ¶ 39; ECF 77-2 at 4.) They determined that the unpaid contributions owed by Alite totaled $533,053.60.  (McGourty Dec. ¶ 40 & ECF 77-2 at 10.)

34.     McGourty calculated that as of January 12, 2024, Alite owed an additional $109,201.20 in interest and, separately, that any award of liquidated damages would total $106,610.72, reflecting 20% of the unpaid principal.  (McGourty Dec. ¶¶ 42-43.)

35.     As reflected in the Audit Report, the bulk of the 11,043.5 hours consist of covered work by four employees: Jose Martinez, 977 hours; Dragan Matovic, 1,488 hours; Keith M. Roseboro, 3,443 hours; and Marcelo Servin, 4,447.50 hours.  (ECF 77-2 at 38, 39, 41, 42.) All four employees are listed as job class "CJ," which appears to denote "Carpenter Journeyman."  (See id. at 15-22.)  The work of Martinez, Matovic, Roseboro and Servin totals 10,355.5 hours.

36.     The Audit Report identifies delinquent contributions owed in smaller amounts for the covered work of an additional twelve employees.  (ECF 77-2 at 34-43.)

37.     Depending on time period and job class, the auditors' report lists unpaid hourly fringe-contribution rates of $46.66, $47.16, $47.41 and $31.72.  (ECF 77-2 at 23-33.) The rates of $46.66, $47.16 and 47.41 are associated with "Job Class CJ," and increased annually in July 2020 and 2021.  (Id. at 26-33.)  The $31.72 rate is associated with "Job Class AP1, 2, 3, 4."  (Id. at 33.)

38.     McGourty testified that to obtain the hourly contribution rates owed by Alite, "[w]e download it from the funds' system."  (Tr. 66.)  "[W]e download an Excel, and the rates, we can access the rates that are posted in the system.  That tells us the rates."  (Tr. 66.) McGourty testified that "[i]t's all electronic" and that auditors are not provided documentation that sets forth the hourly rates.  (Tr. 67.)  He testified: "It's called the ISSI system.  We go in, into a specific employer, we type in a date range, their unique employer number, and then it gives us a sheet with all of their contributions made and what rates they paid.   And we could also go in and look at any other rates that would be applicable to any other CBAs they have, whether they contributed to them or not."  (Tr. 67.)  He stated that he had "no idea" who compiled the rate information used in the audit.  (Tr. 68.)

39.     The Audit Report identified work performed under four different collective bargaining agreements using the following numbers: CBA 00010, CBA 00713, CBA 01101 and CBA 05114.  (ECF 77-2 at 8, 23-33; see also Tr. 70.)

40.     McGourty testified that each agreement is assigned a number.  (Tr. 70.) He could not recall which agreement corresponded to the assigned numbers or what type of work each agreement governed.  (Tr. 69-70.)  However, McGourty testified that none of the four CBAs corresponded to "the flooring association CBA numbers."  (Tr. 70.)

41.    The Remittance History, which recorded contributions actually made by Alite during the period covered in the Audit Report, identifies payments made by Alite under the same four CBAs.  (ECF 94-37 at 1 (CBA 10), 52 (CBA 713, CBA 1101), 53 (CBA 5114).)  The reference to these four CBAs in the Audit Report is consistent with Alite's own payment practices and supports the conclusion that the Audit Report relied upon the correct CBAs.

42.    Alite called no witnesses and offered no exhibits at trial.

43.    Despite McGourty's uncertainty about the source of contribution rates used in the Audit Report, the Court finds that evidence in the trial record establishes by a preponderance of the evidence that the Audit Report applied correct and accurate contribution rates.  This is because the amounts listed in the "Fringe Rate" column in Appendix A of the Audit Report mirror Alite's own payments to the Funds, as reflected in the Remittance History. (ECF 77-2 at 23-33; ECF 94-37.)

44.    As an exemplar, the Court describes evidence regarding employee Claudinei P. Dos Santos.  The auditors concluded that Alite did not remit contributions for Dos Santos's work in the weeks ending April 7 and April 14, 2019, at a Fringe Rate of $46.66 an hour.  (ECF 77-2 at 23.)  The Remittance History shows that in April, May and June of 2019, Alite remitted contributions for Dos Santos's hours at that same $46.66 rate.  (ECF 94-37 at 45.) Thus, the "Fringe Rate" in the Audit Report matches the rate actually remitted by Alite.

45.    The Audit Report and Remittance History show the same $46.66 hourly contribution rates for the following employees: Matthew L. Aldea (ECF 77-2 at 25; ECF 94-37 at 6); Marcos J. Araujo (ECF 77-2 at 25; ECF 94-37 at 52); Wilker Demetrio (ECF 77-2 at 23; ECF 94-37 at 6-7); Wilton Demetrio (ECF 77-2 at 24; ECF 94-37 at 49); Josue Denovaes (ECF 77-2 at 24; ECF 94-37 at 46-47); Gavin Gallard (ECF 77-2 at 25; ECF 94-37 at 7); Danilo

Pessoa (ECF 77-2 at 25; ECF 94-37 at 39-40); Ariel Servin (ECF 77-2 at 25; ECF 94-37 at 27); and Ederson V. Silva (ECF 77-2 at 25; ECF 94-37 at 50-51).

46.     The Remittance History contains no history of payments for hours worked by David Cebic.  The Audit Report states that Cebic appeared in shop steward reports showing 24 hours of work for the week ending May 19, 2019.  (ECF 77-2 at 4, 24.)  The auditors calculated his Fringe Rate as $46.66.  (Id. at 24.)  Based on the Audit Report's consistency with the Remittance History, the Court finds that it is more likely than not that the auditors applied an accurate and correct Fringe Rate to Cebic.

47.     For Isaac Nekita, the auditors concluded that Alite did not remit contributions for the week ending February 2, 2020 at a Fringe Rate of $31.72 an hour.  (ECF 77-2 at 33.)  The Remittance History shows that in November 2019, Alite paid contributions for Nekita's hours at the rate of $31.72.  (ECF 94-37 at 14.)  The Court finds that it is more likely than not that the auditors applied an accurate and correct Fringe Rate to Nekita.

48.     The auditors concluded that Alite made no contributions to the Funds for the 3,443 hours worked by Keith Roseboro.  In the period preceding July 5, 2020, they calculated his Fringe Rate as $46.66.  (ECF 77-2 at 23-26.)  From July 5, 2020 through January 2021, they calculated his Fringe Rate as $47.16.  (ECF 77-2 at 26-28.)  From August 22, 2021 through the end of the audit period, they calculated his Fringe Rate as $47.41.  (ECF 77-2 at 29-33.)  Because Roseboro is not listed in the Remittance History, the Court is unable to compare the Audit Report's rates with Alite's contributions history for this employee.  However, based on the Audit Report's consistency with the Remittance History, the Court finds that it is more likely than not that the auditors applied an accurate and correct Fringe Rate to Roseboro.  The $0.50 rate

increase beginning in July 2020 and the $0.25 increase beginning in August 2021 are consistent with annual contribution increases commencing in July.

49.    The Audit Report concluded that Alite made no contribution for 977 hours worked by Jose Martinez.  The bulk of those hours occurred in 2022 at the Fringe Rate of $47.41 (ECF 77-2 at 31-32) and there is no entry in the Remittance History for Martinez during this time period.  However, for an earlier period, the Audit Report found that Alite did not remit payments for a week ending November 10, 2019, at a Fringe Rate of $31.72.  (ECF 77-2 at 33.)  In 2019, he was in "Job Class AP 1, 2, 3, 4," as opposed to employees in the "CJ" job class subject to $46.66 contribution rates.  (See id.)  The Remittance History shows that in September 2019, Alite paid contributions for Martinez's hours at a rate of $31.72, and that he was classified at skill level "A2" at that time.  (ECF 94-37 at 21.)  Based on the Audit Report's consistency with the Remittance History, the Court finds that it is more likely than not that the auditors applied an accurate and correct Fringe Rate to Martinez.

50.    The Audit Report concluded that Alite made no contributions for 1,488 hours worked by Dragan Matovic.  The Audit Report concluded that beginning in the week ending August 22, 2021, Alite paid him a weekly salary of $3,000.  (ECF 77-2 at 4.)  The auditors attributed forty-hour work weeks to Matovic, and Alite did not respond to requests for supplemental information about Matovic.  (ECF 77-2 at 4.)  Similar to Roseboro, the Audit Report used a Fringe Rate of $46.66 for Matovic until July 2020, when it began to use the rate of $47.16, and, beginning in August 2021, the rate of $47.41.  (ECF 77-2 at 24-32.)  The Remittance History shows that in 2019 and 2020, Alite paid contributions for Matovic's hours at a rate of $46.66.  (ECF 94-37 at 24-25.)  Based on the Audit Report's consistency with the

Remittance History, the Court finds that it is more likely than not that the auditors applied an accurate and correct Fringe Rate to Matovic.

51.    The Audit Report concluded that Alite made no contributions for 4,447.50 hours worked by Marcelo Servin.  It concluded that for approximately six weeks, Servin was paid by salary instead of an hourly basis, requiring auditors to estimate the number of hours that he worked.  (ECF 77-2 at 4.)  Similar to Matovic and Roseboro, the Audit Report listed a "Fringe Rate" of $46.66 until July 2020, when it began to use a rate of $47.16, and, beginning in August 2021, a rate of $47.41.  (ECF 77-2 at 25-32.)  The Remittance History shows that in 2019 and 2020, Alite paid contributions for Matovic's hours at a rate of $46.66.  (ECF 94-37 at 43-44.)  Based on the Audit Report's consistency with the Remittance History, the Court finds that it is more likely than not that the auditors applied an accurate and correct Fringe Rate to Servin.

52.    The $46.66 Fringe Rate reflected throughout the Audit Report and the Remittance History is also consistent with a rate listed in the Independent Resilient Floor Coverers Agreement.  For covered employees with the job titles of Journeyman or Foreman, that agreement lists a total fringe benefit rate of $46.66 per hour through July 1, 2020, after which the rate is listed as "TBD."  (ECF 93-1 at 12.)  The consistency between the "Independent" coverers agreement and the Remittance History supports the testimony of Carey and Davidian that the "Independent" and "Multiemployer" agreements are identical for the purposes of this litigation.

53.    The Court finds that the consistency between the hourly rates used in the Remittance History, the Audit Report and the Independent Resilient Floor Coverers Agreement prove by a preponderance of the evidence that the Fringe Rates used in the Audit Report are accurate and correct, and were understood and accepted by Alite during the period of March 25,

2019 through June 19, 2022. It is more likely than not that these rates are consistent with the rates in the Multiemployer Agreement that was not moved into evidence.

54.      Separate from unpaid contributions, the auditors concluded that Alite did not pay full benefit amounts for certain weeks in 2019. The Audit Report identifies seven weeks in August, September and October 2019 where Alite remitted partial benefit contributions for a limited number of employees at rates $24.63 less than required, over a total of 584 covered hours. (ECF 77-2 at 23.) The Audit Report calculates that Alite owes $14,383.92 on these partial contributions, plus interest. (ECF 77-2 at 23.)

55.      The Court finds that this unrebutted evidence proves that it is more likely than not that Alite did not remit full contribution payments for 584 hours at the deficient rates identified in the Audit Report.

56.      The CBA and the Funds' Statement of Policy for Collection of Employer Contributions all provide for interest, liquidated damages, audit costs and attorneys' fees in the event that the employer did not make required contributions to the Funds. (ECF 94-2 at 44; ECF 94-6 at 8-9; ECF 94-7 at 7-8; ECF 94-8 at 7-8.) The auditors' costs totaled $7,861. (McGourty Dec. ¶ 44.) Article XV, Section 6(a)(2) of the CBA provides for "interest on the unpaid contributions determined at the prime rate of Citibank plus 2%" and "liquidated damages of 20% of the amount of the unpaid contributions . . . ." (ECF 94-2 at 44.)

## CONCLUSIONS OF LAW

57.      Count One of the First Amended Complaint is brought under sections 502 and 515 of ERISA, 29 U.S.C. §§ 1132 and 1145, and section 301 of the LMRA, 29 U.S.C. § 185. (ECF 7.) It asserts that Alite is liable for contributions that it failed to remit to the Funds for covered work performed in the trade and geographical jurisdiction of the CBA. (ECF 7.)

58.     Count Two is brought under section 301 of the LMRA.  (ECF 7.)  It asserts that Alite breached the CBA by failing to remit contributions for work performed in the trade and geographical jurisdiction of the CBA.  (ECF 7.)

59.     The Joint Pretrial Order does not distinguish Count One and Count Two. (ECF 96 at 4.)  At trial, the Funds stated that "they're duplicative counts, frankly" and agreed that the two claims are subject to "the same" standard of proof.  (Tr. 3.)

60.     Section 515 of ERISA states: "Every employer who is obligated to make contributions to a multiemployer plan under the terms of the plan or under the terms of a collectively bargained agreement shall, to the extent not inconsistent with law, make such contributions in accordance with the terms and conditions of such plan or such agreement."  29 U.S.C. § 1145.  "Violations of Section 515, along with the other provisions of ERISA, are enforceable through civil actions brought under 29 U.S.C. § 1132."  New York State Teamsters Conference Pension & Retirement Fund v. United Parcel Serv., Inc., 382 F.3d 272, 278 (2d Cir. 2004).

61.     Pursuant to 29 U.S.C. § 1132(g)(2), when a plan fiduciary is awarded judgment to collect contributions owed under 29 U.S.C. § 1145, "the court shall award" unpaid contributions, interest on unpaid contributions, the amount greater of that interest or liquidated damages not to exceed twenty percent, reasonable attorneys' fees and costs, and "such other legal or equitable relief as the court deems appropriate."

62.     Section 515 "permit[s] trustees of plans to recover delinquent contributions efficaciously, and without regard to issues which might arise under labor-management relations law . . . ."  Benson v. Brower's Moving & Storage, Inc., 907 F.2d 310, 314 (2d Cir. 1990) (quotation marks omitted).  "[I]n enacting this provision, Congress intended to

- 16 -

limit the defenses available to an employer when sued by an employee benefit plan."  DeVito v.

Hempstead China Shop, Inc., 38 F.3d 651, 653 (2d Cir. 1994).

63.    The Court concludes that by entering into the CBA, Alite agreed in section

2 of Article XV to contribute to the Funds "in accord with this Agreement," including, for

resilient floor covering work, to "be governed by the appropriate agreement, signed between the

District Council and the Association of Employers engaged in such work," as set forth in section

9 of Article II.  (ECF 94-2 at 39, 15.)

64.    Much of Alite's post-trial submissions relate to plaintiffs' failure to offer a

copy of the full Multiemployer Agreement incorporated by reference at Article II, section 9 of

the CBA.  The Funds have not explained this lapse.  However, by entering into the CBA and the

International Agreement, Alite agreed to contribute to the Funds, including the rates of the

Multiemployer Agreement incorporated by reference.  The Court concludes that Alite is liable

for unpaid and deficient contributions to the Funds.  29 U.S.C. § 1145 ("Every employer who is

obligated to make contributions . . . under the terms of a collectively bargained agreement shall,

to the extent not inconsistent with law, make such contributions in accordance with the terms and

conditions of such plan or such agreement.").

65.    District courts in this Circuit often use a burden-shifting framework when

the parties dispute the contributions owed by an employer.  See, e.g., Kilkenny as Tr. Constr.

Council Loc. Union 175 Pension Fund v. Flushing Asphalt, LLC, 2024 WL 4333903, at *4

(E.D.N.Y. Sept. 28, 2024).  "Under ERISA, the burden first lies with the Plaintiffs to establish a

prima facie case by showing inaccuracies in the employer's contributions.  Once Plaintiffs make

this showing, the burden shifts to the employer to provide evidence of the precise amount of

work performed, or to refute an audit's assumptions."  Id. (internal citation omitted).  "'While

- 17 -

the Second Circuit has not specifically addressed the applicable standard where a benefit fund contests the amount of contributions owed by an employer, other circuits to consider the issue have held that where a benefit fund produces evidence raising genuine questions concerning an employer's failure to maintain adequate records, the burden shifts to the employer to come forward with evidence either of the precise number of hours worked or to negate the reasonableness of the inferences to be drawn from the plaintiff fund's evidence.'"  Annuity, Welfare & Apprenticeship Skill Improvement & Safety Funds of Int'l Union of Operating Engineers, Loc. 15, 15A, 15C & 15D, AFL-CIO v. Eastport Excavation & Utilities Inc., 3 F. Supp. 3d 204, 214 (S.D.N.Y. 2014) (Gorenstein, M.J.) (quoting Gesualdi v. RRZ Trucking Co., LLC, 2011 WL 1988374, at *4 (E.D.N.Y. May 20, 2011)).

66.     "'Courts within the Second Circuit have regularly applied this burden-shifting analysis at the trial stage.'"  Id. at 215 (quoting Morin v. Spectrum Contracting Grp., Inc., 2011 WL 1323005, at *2 (E.D.N.Y. Jan. 13, 2011)).

67.     Courts may rely on an auditor's report to award unpaid contributions.  See, e.g., Alston as Trustees of The Local 272 Labor-Management Pension Fund v. 1699 New York Ave Parking LLC, 2025 WL 836720, at *6 (S.D.N.Y. Jan. 31, 2025) (Figueroa, M.J.), R&R adopted, 2025 WL 1266893 (S.D.N.Y. May 1, 2025) (Vargas, J.).  "Courts award ERISA benefit plans contributions based on their audit unless the employer can raise a genuine issue of material fact as to the accuracy of the calculations made by the plan, and if there are inaccuracies in an audit due to the employer's records, the plan's audit is accepted."  Board of Trustees of American Federation of Musicians & Employers' Pension Fund v. Banos, 2019 WL 2477316, at *4 (S.D.N.Y. May 24, 2019) (Parker, M.J.), R&R adopted as modified, 2019 WL 2473452 (S.D.N.Y. June 13, 2019) (Koeltl, J.).

- 18 -

68.     The Court concludes that, based on the Audit Report, the Funds have made out a prima facie case that Alite did not remit contributions for 11,043.5 hours worked by covered employees during the 2019-2022 period and that for an additional 584 hours, Alite remitted contributions at an incorrect lower rate.  As detailed above, the Court has found by a preponderance of the evidence that the Audit Report applied the correct "Fringe Rate" for unpaid contributions and correctly calculated the amounts owed for contributions made at the incorrect lower rate.

69.     Alite offered no evidence to rebut the Audit Report.  On cross-examination of McGourty, it elicited testimony that he was uncertain as to the source of the Fringe Rates used in the Audit Report.  However, given the rates' consistency across Alite's own payment history, the Audit Report, and the Independent floor coverers' agreement, McGourty's lack of clarity on these points does not undermine the reliability of the Audit Report.

70.     Accordingly, the Court concludes that the Funds have demonstrated the contributions owed to them by Alite, and that Alite has not come forward with evidence to refute or negate the reasonableness of the Funds' evidence.  See generally Union of Operating Engineers, 3 F. Supp. 3d at 214.  The Court therefore concludes that Alite is liable in the principal amount of $533,053.60.

71.     The Funds are entitled to interest on the unpaid contributions.  29 U.S.C. § 1132(g)(2)(B).  Article XV, Section 6(a)(2) of the CBA provides for "interest on the unpaid contributions determined at the prime rate of Citibank plus 2%."  (ECF 94-2 at 44.)

72.     The Funds are separately entitled to "an amount equal to the greater of" interest on unpaid contributions or, alternatively, liquidated damages provided for in the plan, not to exceed 20 percent of the principal.  29 U.S.C. § 1132(g)(2)(c); see also Alston as Trustee of

Local 272 Labor Management Pension Fund v. Parking 56 LLC, 2021 WL 1163812, at *2

(S.D.N.Y. Mar. 26, 2021) ("A plaintiff prevailing on claims for delinquent contributions under

ERISA may recover (in addition to the amount of unpaid contributions) both 'interest on the

unpaid contributions' and damages measured by the greater of 'interest on the unpaid

contributions' or liquidated damages provided for in the plan.  29 U.S.C. § 1132(g)(2)(B), (C).

Thus, where a plan does not provide for liquidated damages, the plaintiff may recover twice the

amount of interest provided for in the plan.") (Nathan, J.).  Paragraphs 42 and 43 of plaintiffs'

Proposed Findings of Fact sets forth an interest calculation of $109,201.20 as of January 12,

2024, which is higher than the $106,610.72 owed in liquidated damages.  (ECF 110.)  Because

the interest figure is greater than the liquidated damages figure, the Court concludes that the

Funds are entitled to recover twice the amount of interest provided for in the CBA.

73.    The Funds are entitled to "reasonable attorney's fees and costs of the

action . . . ."  29 U.S.C. § 1132(g)(2)(D); see also CBA Art. XV § 6(a)(4).  Aside from the

auditors' costs of $7,861, the Funds have not identified an amount sought for attorneys' fees and

costs.

74.    These Conclusions of Law apply to plaintiffs' LMRA claim set forth in

Count Two under 29 U.S.C. § 185.  See generally Brown v. Sandimo Materials, 250 F.3d 120,

127 (2d Cir. 2001) (when a plaintiff seeks legal relief under 29 U.S.C. § 1132(g)(2), "such relief

will be coextensive with the relief available under the LMRA  . . . ."); Trustees of Local 7 Tile

Industry Welfare Fund v. All Flooring Solutions LLC, 2021 WL 7908025, at *7 (E.D.N.Y. Mar.

13, 2021) ("The same facts that give rise to ERISA liability also establish that the CBA is a

contract between an employer and a labor organization under the LMRA.").  Here, the LMRA

claim is premised on Alite's failure to remit contributions under the same CBA that forms the

basis of the ERISA claim.  (Am. Compl't ¶¶ 53-54.)  As noted, the Funds also stated at trial that "they're duplicative counts, frankly" and agreed that the two claims are subject to "the same" standard of proof.  (Tr. 3.)

75.    To the extent that either party has raised an argument that is not expressly addressed in these Findings of Fact and Conclusions of Law, all such arguments have been considered by the Court.

CONCLUSION

The Court finds and concludes pursuant to Rule 52(a)(1) that defendant is liable to plaintiffs for contributions in the principal amount of $533,053.60, plus twice the interest on those contributions at the prime rate of Citibank plus 2%, and an award of reasonable attorneys' fees and costs.

No later than August 1, 2025, plaintiffs shall file a proposed Judgment that includes principal recovery, interest on the principal, and reasonable attorneys' fees and costs. By that same date, plaintiffs shall file a memorandum of law and any documentation that supports their proposed award of attorneys' fees and costs.  Defendant may respond no later than August 8, 2025.

SO ORDERED.

P. Kevin Castel
United States District Judge

Dated: New York, New York
       July 21, 2025

- 21 -